UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:
K-Ram, Inc.,
        Debtor.                     No. 11-09-10708 SA

**MEMORANDUM OPINION ON CROSS
MOTIONS FOR SUMMARY JUDGMENT
<u>REGARDING FUNDS IN COURT REGISTRY</u>**

This matter is before the Court on cross motions[1] for
summary judgment to determine ownership of funds in the Court's
Registry.  Debtor is represented by William F. Davis & Assoc.,
P.C. (William F. Davis and Anne D. Goodman).  High Desert State
Bank ("HDSB"), the claimant, is represented by the Law Office of
George "Dave" Giddens (Christopher M. Gatton).  This is a core
proceeding concerning administration of the estate.  28 U.S.C. §
157(b)(2)(A).  The Court has considered the Memoranda submitted
by the parties and the cases therein, and conducted its own
research of the cases and treatises and finds that the Debtor's
position should prevail.  As discussed below, the Court finds
that the Assignment in this case was not effective to keep the
asset out of Debtor's estate.  Then, the Court adopts the Deed in
Lieu argument as the most persuasive and bases its ruling
primarily on that ground.  The Court therefore rules that the
funds in the Court registry should be released to Debtor.

---

[1]The relevant documents are: Debtor's Motion for Summary
Judgment (doc 165); HDSB's Response to Debtor's Motion for
Summary Judgment (doc 168); HDSB's Cross-Motion for Summary
Judgment (doc 169); Debtor's Response to HDSB's Cross-Motion for
Summary Judgment (doc 178); and Debtor's Reply to HDSB's Response
to Debtor's Motion for Summary Judgment (doc 179).

**FACTS**

The facts are, generally, not disputed. Debtor proposed forty-one undisputed material facts. HDSB agreed they were not disputed. HDSB proposed two additional facts. Debtor agreed to Fact 42 and part of the Fact 43[2]. In Debtor's Response to HDSB's Cross-Motion, Debtor presented five additional undisputed material facts, numbered 44 through 48. HDSB did not counter them, and under N.M. L.B.R. 7056-1(c) they are deemed admitted.

The Court finds the following to be undisputed:

1. On or about October 2, 2006, the Debtor, as Borrower, executed a promissory note in favor of HDSB in the original principal amount of $751,000.00 (the "Note"). High Desert State Bank's Proof of Claim, Claim 15-1 ("HDSB Claim"), pp. 3-6.

2. On or about October 2, 2006, the Debtor executed a Line of Credit Mortgage (the "Grants Mortgage") in favor of HDSB on property situated in Grants, New Mexico and described as follows:

> Lots numbered One (1) through Eleven (11) in Block numbered One 0); Lots numbered Two (2) through Seven (7) in Block numbered Two (2); Lots numbered One (1) through Fourteen (14) in Block numbered Three (3); Lots numbered One (I) through Fourteen (14) in Block numbered Four (4); and Lots numbered One (1) through Nine (9) in Block numbered Five (5) of VISTAS DE LA VENTANA, an Addition to the City of Grants, Cibola County, New Mexico, as the same is shown and designated on the plat thereof filed in the Office of the County clerk of Valencia County, New Mexico on August 25, 2006 in Book 16 at Page 3202.

---

[2]See Fact 43, below.

Page -2-

(the "Grants Property"). HDSB Claim, 15-1, pp. 7-15; Doc. No. 145-1 (Objection), Exhibit A. The Grants Mortgage also appears at doc 165-2, pp. 5-10 (but missing half the pages, presumably due to one sided copying of a two sided document), and at doc 168-1, pp. 4-14.

3. The Grants Mortgage was recorded on October 5, 2006 at Book 16 p. 5203, as instrument #200603860 in the records of Cibola County, New Mexico. Doc. No. 145-1 (Objection), Exhibit A.

4. The Grants Mortgage secures K-Ram's obligations to the Bank under the Note, up to a maximum obligation of $1,502,000. Doc. No. 145-1 (Objection), Exhibit A, ¶¶ 3, 4.

5. Pursuant to a Loan Modification Agreement dated as of October 2, 2007 between the Debtor and HDSB, Gilbert and Karen Lovato (the "Lovatos") agreed to provide, as additional collateral for the Note, a mortgage in favor of HDSB on property described as:

> Parcel numbered Four (4) of the Plat showing Parcels
> One (1) through Four (4) inclusive, LANDS OF SANTIAGO
> HIDALGO.

HDSB Claim, 15-1, p. 13-17. This property is referred to in this Motion as the "Williams Property."

6. The Lovatos executed a mortgage (the "Williams Mortgage") dated November 2, 2007 in favor of HDSB on the Williams Property, which is also described as 4818 Williams, Albuquerque, New

Mexico. Exhibit 1 to this Motion, Affidavit of Gilbert J. Lovato (hereinafter "Lovato Aff.") ¶ 4, Exhibit B.

7. The Williams Mortgage was recorded on November 9, 2007, as instrument #2007155852, of the records of Bernalillo County, New Mexico. Exhibit 1, Lovato Aff., ¶ 4, Exhibit B.

8. The Williams Mortgage secures the obligations of Debtor and the Lovatos under the Note. Exhibit 1, Lovato Aff., ¶ 4, Exhibit B, page 2, ¶ 4.

9. Pursuant to a Loan Modification Agreement dated March 24, 2008, the principal amount of the Note was increased to $1,250,000.00. HDSB Claim, Doc. 15-1, pp. 16-18.

10. Gilbert and Karen Lovato are guarantors of the Debtor's obligations to HDSB under the Note. Exhibit 1, Lovato Aff, ¶ 3, Exhibit A, page 1.

11. On December 26, 2007, Westar filed a lien against the Grants Property in the amount of $33,495.00 (the "Lien"), and recorded in Cibola County, New Mexico in Book 17 at Page 9476 as Document #200704241. Adv. Pro 09-1072, Doc. No. 3, pp. 10-25.

12. On May 19,2008, the Debtor and the Lovatos ("Petitioners") filed an action against Westar in the Thirteenth Judicial District Court, Cibola County, numbered CV-2008-0163 to set aside

Page -4-

the Lien (the "Westar Litigation").  Adv. Pro. 09-1072, Doc. No. 3, p. 1 [3].

13.  On or about August 19, 2008, the "Stipulated Order Discharging Lien on Deposit of Funds to Secure Claims" was entered in the Westar Litigation (the "Stipulated Order").  Doc. No. 145-2 (Objection), Exhibit B.

14.  The parties to the Stipulated Order are K-Ram and the Lovatos, as Petitioners, and Westar and Barry Lytle, as Respondents.  Doc. No. 145-2 (Objection), Exhibit B.

15.  The Order orders Petitioners to deposit the sum of $50,000 with the clerk of the Thirteenth Judicial District Court "as the amount of cash necessary to be deposited by Petitioners for the discharge of the ... Lien ...." and that, upon such deposit, the "Claim of Lien ... is discharged and the Cibola County Clerk is directed to cancel such Claim of Lien... ."  Doc. No. 145-2 (Objection), Exhibit B, pp. 1-2.

16.  The Order was recorded on August 21, 2008 in Cibola County, New Mexico at Book 18 p. 5653, as document #200802260.  Exhibit 2

---

[3]The Westar Litigation was removed to this Court.  The Court has taken judicial notice of the adversary file.  The complaint was filed by Gilbert J. Lovato, Karen L. Lovato, and K-Ram, Inc. against Barry Lytle and Westar Concrete & Construction, Inc.  It seeks cancellation of a lien; actual, special and punitive damages for slander of title; and damages including treble damages under the Unfair Practices Act; plus attorney fees and pre- and post-judgment interest.

Page -5-

to this Motion, Affidavit of Don Sanchez (hereinafter "Sanchez Aff.") ¶¶ 3, 4, Exhibit B.1.

17.  On or about August 20, 2008, K-Ram sold to Valerie and Jeremy Liska and conveyed by Warranty Deed Lot numbered Seven (7) in Block numbered Two (2) of the Grants Property ("Lot 7"), for a sales price of $240,000.00.  Exhibit 2, Sanchez Aff., ¶¶ 3, 4, 5, 6, Exhibit B.2, Exhibit C.

18.  At closing, the "gross amount due to seller" was reduced by settlement charges including the following:

| 1304. | Payoff: High Desert State Bank | $155,500.00 |
| 1305. | Funds Held: 13th Judicial District Court | $ 50,000.00 |

Exhibit 2, Sanchez Aff., ¶¶ 6, 7, Exhibit C lines 601, 602, 1304, 1305.

19.  The title company that closed the sale disbursed the $50,000 to the Thirteenth Judicial District Court.  Exhibit 2, Sanchez Aff., ¶¶ 6, 7, Exhibit C.

20.  On August 26, 2008, HDSB executed a Partial Release of Mortgage as to Lot 7 (the "Lot 7 Release") stating that: "High Desert State Bank, mortgagee under [the Grants Mortgage] ... does hereby discharge all of the real estate mentioned in said mortgage from the lien and operation thereof."  Exhibit 2, Sanchez Aff., ¶¶ 3, 4, 5, Exhibit B.3.

Page -6-

21.  The Lot 7 Release was recorded in Cibola County on August 29, 2008 in Book 18 at page 5807.  Exhibit 2, Sanchez Aff., ¶¶ 3, 4, 5, Exhibit B.3.

22.  The "Assignment of Any and All Excess Proceeds" (the "Assignment") attached to the Objection is unrecorded.  Doc. No. 145 (Objection), Exhibit C.

23.  On February 6, 2009, HDSB filed a Complaint for Foreclosure (the "Foreclosure), in the matter styled <u>High Desert State Bank v. Gilbert J. Lovato, Karen L. Lovato, K-Ram, Inc., et al .</u>, No. CV-200901321, in the Second Judicial District Court, seeking foreclosure of the mortgages on the Grants Property and the Williams Property.  Doc. No. 51 (Stay Relief Order) ¶11; Exhibit 1, Lovato Aff., ¶ 5, Exhibit C.

24.  On February 24, 2009, the Debtor filed a chapter 11 petition, commencing this Bankruptcy Case.  Doc. No. 1

25.  The Debtor listed the $50,000 as an asset. Doc. No. 17, p. 7, Schedule B.35.

26.  The Debtor listed HDSB's security for the Note as the Grants Property owned by the Debtor and the Williams Property.  Doc. No. 17, pp. 3, 13, Schedule A and D.

27.  On April 24, 2009, this Court entered the Stipulated Order Terminating Automatic Stay and Approving Abandonment of Property of the Estate (the "Stay Relief Order").  Doc. No. 51.

28.  The Stay Relief Order provides that the "automatic stay is hereby lifted to allow the Bank in the Foreclosure Action ... to fully exercise [its] state law rights and remedies in regard to the [Grants] Property, including, but not limited to continuing the Foreclosure Action ... . " and approved an abandonment of the Grants Property.  Doc. No. 51, page 3.

29.  On May 22, 2009, the Debtor removed the Westar Litigation to this court.  Adv. Pro. 09-1072, Doc. 1.

30.  On June 10, 2009, HDSB filed a proof of claim in this case, asserting a secured claim in the amount of $1,093,903.90, secured by "real estate."  Claim 15-1.

31. On or about May 12, 2009, K-Ram sold to Dolores Vallejos and conveyed by Warranty Deed Lots Five (5) and Six (6) of Block Two (2) of the Grants Property and now known as Lot Numbered 5A of Block Two (2) ("Lot 5A").  Exhibit 2, Sanchez Aff., ¶¶ 3, 4, 5, 8, Exhibit B.4, B.5, Exhibit D.

32.  On June 16, 2009, HDSB executed a Partial Release of Mortgage as to Lot 5A (the "Lot 5A Release") stating that: "High Desert State Bank, mortgagee under [the Grants Mortgage] ... does hereby discharge all of the real estate mentioned in said mortgage from the lien and operation thereof."  Exhibit 2, Sanchez Aff., ¶¶ 3, 4, 5, Exhibit B.6.

33.  The Lot 5A Release was recorded in Cibola County on June 24, 2009 in Book 19 at page 2008.  Exhibit 2, Sanchez Aff., ¶¶ 3, 5, Exhibit B.6.

34.  On July 22, 2009, the $50,000 was transferred from the Thirteenth Judicial District Court, Cibola County, to the registry of this Court.  Adv. Pro Docket #9.

35.  On or about January 20, 2010, HDSB, as "Lender," and the Debtor and the Lovatos, as "Borrowers," entered into an Agreement for Deed in Lieu of Foreclosure (the "Deed in Lieu Agreement"). Exhibit 1, Lovato Aff., ¶ 6, Exhibit D.

36.  The Deed in Lieu Agreement describes the subject property as the Grants Property Less Lot 7 and Lot 5A and the Williams Property.  Exhibit 1, Lovato Aff., ¶ 6, Exhibit D at pages 1-2.

37. The Deed in Lieu Agreement contains the following provisions:

> 6.    Lender agrees to accept a Special Warranty Deeds [sic] (deed) from Borrowers in lieu of foreclosure of its Mortgage provided that all of the terms and conditions of this agreement are fulfilled. Lender agrees that, upon acceptance of the Deed in Lieu of Foreclosure, Borrowers will be released from all further liability pursuant to the Note and/or Mortgage. This release of liability also includes the guarantors of the debt.
> ...
> 10. Upon the execution of the deed by Borrowers and acceptance thereof by Lender, and the receipt by Lender of a merchantable title to the above-referenced real property, free and clear of liens or encumbrances, Borrowers shall be released from all liability pursuant to the Note and Mortgage and Lender will deem the Note to be paid in full.

Exhibit 1, Lovato Aff., ¶ 6, Exhibit D.

38.  On February 1, 2010, a Special Warranty Deed from K-Ram to HDSB to the Grants Property less Lot 7 and 5A was recorded in Cibola County, New Mexico, in Book 19 at page 6739 as Document No. 201000205.  Exhibit 2, Sanchez Aff., ¶¶ 3, 4, 5, Exhibit B.7.

39.  On December 30, 2009, a Special Warranty Deed from the Lovatos to HDSB for the Williams Property was recorded in Bernalillo County, New Mexico, as Document #2009140869.  Exhibit 1, Lovato Aff., ¶ 7, Exhibit E.

40.  By orders entered February 26, 2010 and March 3, 2010, this Court approved a settlement of the Westar Litigation pursuant to which Westar accepted $10,000 in full settlement of its claims to the $50,000, leaving the $40,000 undistributed.  Doc. No. 147, Doc. No. 150.

41.  HDSB objects to Debtor receiving any of the $40,000, on the following grounds:

> a. "[A]s proceeds from the sale of the mortgaged property, [the Undistributed Funds] rightly belong to HDSB pursuant to the [Grants] Mortgage.
> b. Additionally, the refund of any monies deposited in the Court Registry was explicitly assigned to HDSB in the Assignment."  Doc. #145 (Objection), ¶ 8.

42.  The funds deposited into the Court Registry pursuant to the Stipulated Order Discharging Lien on Deposit of Funds to Secure Claims (the "Stipulated Order") were deposited with the consent of High Desert State Bank so that the sale of the mortgaged property could occur free and clear of the lien of Westar. Affidavit of Rusty Dillon, attached hereto as Exhibit A, ¶ 3.

43.  Consent of HDSB was necessary for the sale to occur, since the bank was allowing $50,000 of the sale proceeds which it would rightly receive to be used to bond around the lien of Westar.

With respect to the second sentence of Fact 43, HDSB alleges, but Debtor disputes, that consent to the use of the proceeds to bond around the lien was only given with the expectation[4] that HDSB would receive any surplus proceeds once the state court had determined the amount that Westar would receive.  HDSB cites Exhibit A, ¶ 4 and the "Assignment of Any and All Excess Proceeds" attached as Exhibit B.

44.  In discussions between Gilbert Lovato and representatives of HDSB including Russell C. Dillon, in connection with the Deed in Lieu Agreement dated January 20, 2010, no bank representative said anything about or made reference to the bank having a continuing claim to the $50,000.  Affidavit of Gilbert Lovato, Exhibit 1, ¶¶ 4, 6.

45.  Mr. Lovato's understanding was that by entering into the Deed in Lieu Agreement, K-Ram's liability to HDSB under the Note and/or the Mortgages was being satisfied in full by the deeds to the bank of the remaining Grants property and the Williams property.  Exhibit 1, Lovato Response Aff. ¶ 5.

---

[4]This dispute does not prevent summary judgment in this case.  The intent of the parties is not relevant when a court determines if a transaction is a security agreement.  See infra p. 20.

46.  At the time the Deed in Lieu Agreement was executed, Mr. Lovato understood that the bank had no further claim to the funds.  Exhibit 1, Lovato Response Aff. ¶ 7.

47.  The appraised value of the properties deed to HDSB pursuant to the Deed in Lieu Agreement was $1,175,600.  Exhibit 1, Lovato Response Aff. ¶ Exhibit 1.A and 1.B.

48.  At the time the Deed in Lieu Agreement was executed, the indebtedness under the Note was $1,163,118.93.  Debtor's Motion, Exhibit 1.D, doc 165-2 at p. 20.

**DISCUSSION**

**a.  Debtor's Arguments**

Debtor argues five theories that the funds on deposit belong to Debtor, as follows:

First, Debtor claims that HDSB has no claim to "proceeds" under the Grants Mortgage.  Debtor concedes that the remaining funds are part of the $50,000 paid into the Cibola Court Registry from the closing of the sale of Lot 7.  But, Debtor points out that the Grants Mortgage's only reference to "proceeds" is in the section dealing with the assignment of leases and rents.  It has no reference to the proceeds from a sale.  Furthermore, Debtor claims that HDSB's release of Lot 7, which contained no language preserving an interest in proceeds, extinguished any claim by HDSB to the remaining funds.

Page  -12-

Second, Debtor argues that HDSB's claim that the Assignment, dated August 21, 2008, entitles it to the funds must fail. Debtor states that, assuming the Assignment validly created a lien on the funds derived from the Lot 7 sale, HDSB had only a security interest in the funds, which would be considered an "account" under the New Mexico Uniform Commercial Code. A security interest in accounts is perfected by filing a financing statement. No financing statement was filed. Therefore, HDSB has no perfected lien on the funds.

Third, Debtor argues that the Stipulated Order entered in the Westar litigation could not and did not create a claim in favor of HDSB. That Order only stated that the $50,000 was deposited so that Westar's lien could be released. The Order does not mention HDSB and HDSB was not a party to that case.

Fourth, Debtor argues that HDSB is time barred from asserting a claim to the funds. The bar date in this case was June 15, 2009. The notice of bar date required a creditor to file a proof of claim if it disagreed with how the Debtor had scheduled its claim. Debtor listed the remaining funds as an unencumbered asset on Schedule B and did not include the remaining funds as collateral for HDSB on Schedule D. HDSB did file a proof of claim and made no claim that the remaining funds were collateral. Therefore, Debtor argues that HDSB cannot at this time claim the funds.

Page -13-

Fifth, and finally, Debtor argues that even if HDSB had a valid claim under the Mortgage, the Assignment, or the Order, it has since released that claim in full. The Deed in Lieu Agreement reflects that Lot 7 and Lot 5A were sold and the legal description omitted those lots. The Deed in Lieu Agreement addressed the entire existing liability under the mortgage including accrued interest. HDSB agreed to accept the Special Warranty Deeds to the remaining Grants property and the Williams property in lieu of foreclosure and released borrowers and guarantors from all further liability, terminating the mortgagor-mortgagee relationship and HDSB would deem the Note to be paid in full. The Agreement also stated it was the entire agreement of the parties. Debtor executed the deeds. The Agreement made no mention of the $50,000. Debtor argues, therefore, that as a matter of law there is no remaining liability against which the funds could be applied.

**b.** **HDSB's Arguments**

HDSB also argues five theories that the funds on deposit belong to HDSB, as follows:

First, HDSB denies Debtor's argument that HDSB has no claim to the proceeds because the Grants Mortgage does not specifically provide a lien on proceeds. HDSB claims that the Grants Mortgage does not need to so because it contains the term "statutory

mortgage condition"[5] which under N.M. Stat. Ann. § 47-1-41[6]
(1978) means, among other things, that proceeds shall be applied
to the payment of the mortgagee's debt. Debtor disputes that
this statute applies.

Second, HDSB argues that the sale proceeds are not property
of the Debtor or the estate, and that therefore HDSB did not need
to assert a claim to those funds. HDSB argues that when it
consented to allow $50,000 of its proceeds to be deposited into
the state court registry with the condition that any surplus
funds would be paid toward the loan balance when the lien was
resolved, it had control over the funds sufficient to establish
constructive possession. Consequently, HDSB claims that the
funds were not part of the bankruptcy estate. HDSB cites <u>Admin.</u>

---

[5]This language appears on the Grants Mortgage as page 2 of
the 10 page document. This page is missing from the copy at doc.
165-2, but appears in the copy at doc. 168-1 at page 5.

[6]That section provides:
§ 47-1-41. **Construction of "statutory mortgage condition"**
In a mortgage or deed of trust by way of mortgage of real estate
the words, "statutory mortgage condition" shall have the full
force, meaning and effect of the following words and shall be
applied and construed accordingly: "in the event any of the
following terms, conditions or obligations are broken by the
mortgagor, this mortgage (or deed of trust) shall thereupon at
the option of the mortgagee, be subject to foreclosure and the
premises may be sold in the manner and form provided by law, and
the proceeds arising from the sale thereof shall be applied to
the payment of all indebtedness of every kind owing to the
mortgagee by virtue of the terms of this mortgage or by virtue of
the terms of the obligation or obligations secured hereby:
[list of six duties of mortgagor.]

Page -15-

<u>Comm. of the Wal-Mart Assocs. Health & Welfare Plan v. Willard</u>, 393 F.3d 1119 (10th Cir. 2004) as support.

Third, HDSB claims that although the Assignment of Any and All Excess Proceeds was not recorded it is still clear evidence of everyone's intent that the surplus funds should be paid directly to HDSB.

Fourth, HDSB argues that the "Lot 7 Release" did not affect HDSB's claim to the funds.  HDSB claims that the document refers only to the real estate being released from its claim, not any proceeds from real estate.

Fifth, and finally, HDSB argues that the Deed in Lieu Agreement did not affect HDSB's claim to the funds.  HDSB argues that this results from the fact that Debtor had no interest in the funds and that HDSB had constructive possession.

<u>c.</u>    <u>Court's decision</u>

<u>1.</u>    <u>The Assignment did not remove the assets from the estate.</u>

HDSB's second and fifth arguments focus on HDSB's claim of ownership of the fund.  The Court finds that neither argument should prevail.

The state court lawsuit filed by Debtor was for slander of title to a lot it was developing.  Adv. Pro. 09-1072, doc. 3, p. 1.  Under New Mexico law, slander of title is a tort.  <u>Den-Gar Enter. v. Romero</u>, 94 N.M. 425, 430, 611 P.2d 1119, 1124

Page -16-

(Ct.App.), cert. denied, 94 N.M. 628, 614 P.2d 545 (1980).  See also Restatement (Second) of Torts § 624 (1977).

The Uniform Commercial Code was revised in 2001.  N.M. Stat. Ann. 1978 § 55-9-101, et. seq.  Before the Revision all tort claims were excluded from the scope of Article 9.  Hillman, Documenting Secured Transactions § 3:11.10 (2010).  The Revision created a new category of collateral, "commercial tort claims[7]" and included them in Article 9's coverage.[8]  Id.

Debtor's state court case was a commercial tort claim.  The assignment of that claim is within the scope of Article 9.

Filing of a financing statement is required to perfect an interest in a commercial tort claim.  N.M. Stat. Ann. 1978 § 55-

---

[7]See N.M. Stat. Ann. 1978 § 55-9-102(a)(13):
(13) "commercial tort claim" means a claim arising in tort with respect to which:
(A) the claimant is an organization; or
(B) the claimant is an individual and the claim:
(i) arose in the course of the claimant's business or profession; and
(ii) does not include damages arising out of personal injury to or the death of an individual[.]
A commercial tort claim is not a "general intangible."  Id. at (a)(42).  It is also not an "account."  Id. at (a)(2)(c)(ii).

[8]See N.M. Stat. Ann. 1978 § 55-9-109(d)(12) ("Chapter 55, Article 9 NMSA 1978 does not apply to ... an assignment of a claim arising in tort, other than a commercial tort claim[.]") The obvious inference is that Article 9 does apply to an assignment of a commercial tort claim.

Page -17-

9-310(a)[9]. <u>See also</u> <u>Helms v. Certified Packaging Corp.</u>, 551 F.3d 675, 679 (7th Cir. 2008). HDSB did not file.

When a bankruptcy is filed, the "strong arm" powers of 11 U.S.C. § 544(a)(1) grant the trustee[10] the status of hypothetical lien creditor. <u>Morris v. Hicks (In re Hicks)</u>, 491 F.3d 1136, 1140 (10th Cir. 2007). The rights of a lien creditor are determined under state law. <u>Id.</u> New Mexico law subordinates an unperfected security interest to the rights of a person that becomes a lien creditor before the security interest is perfected. N.M. Stat. Ann. § 55-9-317(a)(2)[11].

HDSB claims that it is not merely a creditor holding an unperfected security interest. It claims to be the owner of the

---

[9]That section provides: "Except as otherwise provided in Subsection (b) of this section and in Section 55-9-312 NMSA 1978, a financing statement must be filed to perfect all security interests and agricultural liens." Note: Neither 55-9-310(b) or 55-9-312 reference commercial tort claims. Therefore, the only method to perfect is by filing.

[10]A debtor in possession has all of the rights and powers of a trustee, with limited exceptions not relevant here. 11 U.S.C. § 1107(a).

[11]That section provides:
A security interest or agricultural lien is subordinate to the rights of:
...
(2) except as otherwise provided in Subsection (e) of this section, a person that becomes a lien creditor before the earlier of the time:
(A) the security interest or agricultural lien is perfected; or
(B) one of the conditions specified in Paragraph (3) of Subsection (b) of Section 55-9-203 NMSA 1978 is met and a financing statement covering the collateral is filed.

asset by way of the Assignment.  Black's Law Dictionary (9th ed.
2009) defines an "absolute assignment" as "an assignment that
leaves the assignor no interest in the assigned property or
right."  And, it defines a "collateral assignment" as "an
assignment of property as collateral security for a loan."

Revised Article 9 on its face does not distinguish between
an absolute assignment and a collateral assignment of commercial
tort claims.  This is likely intentional.  Article 9 requires
filing to perfect a buyer's or assignee's interest in accounts,
chattel paper, payment intangibles, or promissory notes, whether
they were transferred outright or assigned as collateral.
Compare Ta Chong Bank Ltd. v. Hitachi High Technologies America,
Inc., 610 F.3d 1063, 1066 (9th Cir. 2010)( "In order to perfect
its interest in the CyberHome accounts assigned to the Bank, the
Bank was required to file a financing statement.  Cal. Com. Code
§ 9310(a).") See also Octagon Gas Systems, Inc. v. Rimmer (In re
Meridian Reserve, Inc.), 995 F.2d 948, 954 (10th Cir.), cert
denied, 510 U.S. 993 (1993)("Although Article 9 applies mainly to
transactions intended to create security interests, it also
applies to sales of accounts because sales of wholly intangible
interests in accounts create the same risks of secret liens
inherent in secured transactions.")(Citations omitted.)(Decided
under former law.)  Likewise, the Court finds that there exists
the same dangers in assignments of commercial tort claims.

Page -19-

Under Revised Article 9, a "security interest" is defined as

> "security interest" means an interest in personal
> property or fixtures that secures payment or
> performance of an obligation.  "Security interest"
> includes any interest of a consignor and a buyer of
> accounts, chattel paper, a payment intangible or a
> promissory note in a transaction that is subject to
> Chapter 55, Article 9 NMSA 1978.

N. M. Stat. Ann. 1978, § 55-1-201(b)(35).  Uniform Commercial

Code Comment 3(b) to N. M. Stat. Ann. 1978, § 55-9-102 provides:

> 3. Definitions Relating to Creation of a Security
> Interest.
> ...
> b. "Security Agreement."
> ...
> Whether an agreement creates a security interest
> depends not on whether the parties intend that the law
> characterize the transaction as a security interest but
> rather on whether the transaction falls within the
> definition of "security interest" in Section 1-201.
> Thus, an agreement that the parties characterize as a
> "lease" of goods may be a "security agreement,"
> notwithstanding the parties' stated intention that the
> law treat the transaction as a lease and not as a
> secured transaction.

As noted above, assignments of commercial tort claims are subject

to Article 9.  HDSB's and Debtor's intent to create a security

interest in the tort claim were irrelevant.  The issue is whether

the transaction falls within the definition of security interest.

The Court finds that it does.  HDSB did not file a financing

statement and was therefore not perfected when Debtor filed its

bankruptcy.  In consequence, the funds became an asset of the

Debtor's estate.

However, even if Article 9 does not apply to "absolute" assignments of commercial tort claims, the Court finds that the assignment in this case was not absolute. New Mexico has few cases regarding assignments. However, the theories have been fully developed in the common law of other jurisdictions. Basically,

> An assignment is an act or expression of intention by which one person causes a transfer of a right or interest in property. In re Estate of Boyd, 606 P.2d 1243 (Wyo. 1980).
> ...
> The language of an assignment ... may be informal so long as the language utilized, coupled with the surrounding circumstances, reveals an intent by the owner to transfer a present interest ... . Seasons, Inc. v. Atwell, 86 N.M. 751, 527 P.2d 792 (1974). ...
> To be legally enforceable, an assignment must describe the subject matter with sufficient particularity to render it capable of identification. Nickell v. United States ex rel. D.W. Falls, Inc., 355 F.2d 73 (10th Cir. 1966). The intent of an assignor is to be gleaned, if possible, from the document itself. Seasons, Inc. v. Atwell. The meaning of an assignment is to be determined with reference to the intention of the drafter at the time the agreement was made. E.g., Young v. Thomas, 93 N.M. 677, 604 P.2d 370 (1979) (if there is ambiguity, intent may be ascertained by language and conduct of parties, objects sought to be accomplished by the agreement, and circumstances surrounding execution of the agreement).
> In construing an assignment, as in the construction of contracts generally, when the words employed are free from ambiguity, there is no occasion for interpretation. Absent ambiguity reflected in the wording of the instrument, it is the court's duty to give effect to the language of the entire document in accordance with the commonly accepted and ordinary meaning of the words. Broyles v. Iowa Department of Social Services, 305 N.W.2d 718 (Iowa 1981).

Case 09-10708-s11    Doc 211    Filed 03/22/11    Entered 03/22/11 15:33:49 Page 21 of 38

<u>Benton v. Albuquerque Nat'l Bank</u>, 103 N.M. 5, 10-11, 701 P.2d 1025, 1030-31 (Ct.App. 1985).

> To be an effective assignment, the assignor must divest itself of all right, interest, and control in the property assigned. Any act or words that show an intention to transfer all interests to the assignee are sufficient for a valid assignment; in other words, no specific or magic words are necessary for its formation. ... . As the trustee points out, however, a mere promise to pay a debt out of a designated fund does not operate as an effective assignment where the assignor continues to control the fund; retention of control precludes the perfection of an assignment. Accordingly, our analysis centers on the parties' intent in entering the June 1995 transactions and whether and to what extent CEA retained control over the Contract proceeds.

<u>Advanced Testing Technologies, Inc. v. Desmond (In re Computer Engineering Associates, Inc.)</u>, 337 F.3d 38, 46 (1st Cir. 2003) (citations and footnotes omitted.)("CEA")(Applying both New York and Massachusetts law, which were the same). In the CEA case, the First Circuit examined the actions the parties took both before and after the challenged assignment of a contract. It found that all actions taken supported the contention that the transaction was irrevocable and had divested CEA of its ability to receive any proceeds from the contract directly. <u>Id.</u> at 47. Specifically, CEA executed an agreement and "irrevocable assignment," set up a joint bank account, transferred to plaintiff the responsibility for preparing invoices and requests for progress payments, provided plaintiff with full access to its computer system, instructed the bank to provide copies of all

Page -22-

notices and actions concerning a related loan account and
obtained authorization from CEA to make inquiries of the account.
Id. The court found that CEA had given up all right, title and
interest and that therefore the assignment was absolute. Id. at
50. Accord Christmas v. Russell, 81 U.S. 69, 84 (1871)

> The assignor must not retain any control over the
> fund-any authority to collect, or any power of
> revocation. If he do, it is fatal to the claim of the
> assignee. The transfer must be of such a character
> that the fundholder can safely pay, and is compellable
> to do so, though forbidden by the assignor.

See also TPZ Corp. v. Dabbs, 25 A.D.3d 787, 789, 808 N.Y.S.2d
746, 749 (2006)("In order for an assignment to be valid, the
assignor must be divested of all control over the thing
assigned." Court reversed summary judgment due to question of
fact whether assignor "continued to act as if it owned the
note.")

In determining whether an assignment is for security, a
court may also look at the business activities of the parties,
their relationship, the objective of the purported assignment,
and whether the evidence suggests that there was a total
divestment of all control by assignor over the thing assigned.
In re Tyson Metal Products, Inc., 117 B.R. 181, 184-85 (Bankr.
W.D. Pa. 1990). If the debtor is left with access to the asset
or if the assignee fails to notify the obligor of the assignment,
this is evidence that the parties intended a security interest
and not an absolute assignment. Id. at 185.

Page -23-

In this case, HDSB and Debtor had an ongoing banking relationship through which HDSB was financing a real estate development. Their prior history involved loans and mortgages. While this transaction was different in that it involved a cause of action in tort, it seems odd that the intention would be to transfer the action to HDSB for $50,000 instead of taking a lien in the asset. Generally, banks are in the business of making loans and obtaining mortgages and security interests in collateral, not buying their customer's tort actions. This suggests that an assignment for security was intended.

If one makes an absolute assignment of a cause of action, that person loses standing to pursue, continue, or settle it because they are no longer the real party in interest. <u>See</u> Wright, Miller, Kane and Marcus, 6A Federal Practice & Procedure § 1545 (3d ed.)("Under present law an assignment passes the title to the assignee so that the assignee is the owner of any claim arising from the chose and should be treated as the real party in interest under Rule 17(a)."). Debtor instituted the state court tort action, pursued it, removed it to bankruptcy court, and settled it. If Debtor had truly absolutely assigned the asset to HDSB, it would have lost its standing to remain in the case after August 21, 2008. HDSB should not be allowed to claim it owned the lawsuit after allowing Debtor to pursue it to completion. This suggests the Assignment was for security.

HDSB did not intervene in the lawsuit either before or after it was removed from state court. There is no indication in the record that anyone other than Debtor and HDSB knew that HDSB was claiming ownership or a lien on the asset. The only parties to the lawsuit were Debtor and Westar. Anyone examining the court files would have assumed that Debtor had a claim to the funds. This is the situation Article 9 is designed to prevent. This suggests the Assignment was for security.

HDSB had no control over the lawsuit. It filed no claim of lien or transfer of ownership in the lawsuit. It was not a party. In other words, the "obligor" (the state district court holding the funds) had no notice of the assignment. <u>Compare Computer One, Inc. v. Grisham & Lawless, P.A.</u>, 144 N.M. 424, 429, 188 P.3d 1175, 1180 (2008):

> "In New Mexico, there are four requirements for the imposition of an attorney charging lien." <u>Sowder v. Sowder</u>, 1999-NMCA-058, ¶ 10, 127 N.M. 114, 977 P.2d 1034. First, there must be a valid contract between the attorney and the client, although the contract need not be express. <u>Id.</u> Second, there must be a judgment, or "fund," that resulted from the attorney's services. <u>Id. ¶ 11.</u> Third, the attorney must have given clear and unequivocal notice that he intends to assert a lien, and notice must be given to the "appropriate parties." <u>Id. ¶ 12.</u> Finally, the lien must be timely-notice of the lien must be given "before the proceeds [from] the judgment have been distributed." <u>Id. ¶ 14.</u> Our cases have put attorneys on notice to file the charging lien and enforce it "in the court in which the underlying suit is filed, not in an independent action." <u>Thompson v. Montgomery & Andrews, P.A.</u>, 112 N.M. 463, 467, 816 P.2d 532, 536 (Ct.App. 1991). Failing to meet these requirements, an attorney may not invoke the equitable powers of the court to

> impose a lien, but must resort to remedies at law, such
> as a subsequent lawsuit for breach of contract long
> after proceeds have been disbursed.  See <u>Sowder</u>,
> 1999-NMCA-058, ¶ 8, 127 N.M. 114, 977 P.2d 1034.

The Court is not suggesting that HDSB should have taken all these steps; rather, if it had taken any step it might demonstrate that it attempted to retain some control over the funds.  As it was, the Debtor could have sought voluntary dismissal or could have submitted an Order, if Westar had consented, to disburse the funds in any way the parties agreed without HDSB's knowledge or consent.  Debtor retained complete control over the asset.  This suggests that it was an assignment for security.

In summary, the Court finds that the Assignment was one for security.  As such, it was governed by Article 9 of the Uniform Commercial Code.  HDSB did not perfect its interest, which falls to the Debtor's strong arm powers.

### 2. **HDSB released all claims in its Deed in Lieu Agreement.**

The Court finds that the Deed in Lieu Agreement is clear and unambiguous.  And, neither party claims otherwise.  It was duly executed by the Debtor, by Gilbert J. Lovato its President and attested to by Debtor's Corporate Secretary Karen L. Lovato, by the Lovatos individually as guarantors, and by HDSB by its executive vice president.  "When a contract or agreement is unambiguous, we interpret the meaning of the document and the

intent of the parties according to the clear language of the document, and we enforce the contract or agreement as written." Espinosa v. United of Omaha Life Ins. Co., 139 N.M. 691, 699, 137 P.3d 631, 639, 2006-NMCA-075, {26} (Ct.App.), cert. denied, 140 N.M. 225, 141 P.3d 1279, 2006-NMCERT-6 (2006).

Relevant paragraphs of the Agreement are as follows:

6. Lender agrees to accept a Special Warranty Deeds [sic] (deed) from Borrowers in lieu of foreclosure of its Mortgage provided that all of the terms and conditions of this agreement are fulfilled. Lender agrees that, upon acceptance of the Deed in Lieu of Foreclosure, Borrowers will be released from all further liability pursuant to the Note and/or Mortgage. This release of liability also includes the guarantors of the debt.
...
9. The execution by Borrowers of the deed will terminate the mortgagor-mortgagee relationship between Borrowers and Lender. ...
10. Upon the execution of the deed by Borrowers and acceptance thereof by Lender, and the receipt by Lender of a merchantable title to the above-referenced real property, free and clear of liens or encumbrances, Borrowers shall be released from all liability pursuant to the Note and Mortgage and Lender will deem the Note to be paid in full.
...
15. ...[T]his agreement contains the entire agreement of the parties. ...
16. It is specifically acknowledged and agreed between the parties hereto that all personal property and or fixtures including with [sic; without] limitation ... is and shall be the sole and exclusive property of HDSB as of the date of this agreement. ...

Facts 38 and 39 demonstrate that the Special Warranty Deeds referenced in the Agreement were delivered, accepted, and recorded by HDSB. The Borrower and guarantors were released from all liability and HDSB was deemed to be paid in full. The

Agreement states that it is the entire agreement of the parties. The Agreement included property other than the real estate in paragraph 16 but made no reference to the funds on deposit with the Court. The Court must interpret this to mean that the funds were specifically excluded from the Agreement (i.e., their turnover to HDSB was not a condition of release) and the debt is now paid in full.

Furthermore, even if HDSB could prevail on any of its other arguments, the Deed in Lieu Agreement trumps them all by cancelling the debt obligations without reference to the funds. The Court will enter an Order in favor of K-Ram.

**3.    HDSB has no lien on the proceeds in the Court Registry.**

HDSB had a valid lien on the real estate but the Court finds that this lien did not extend to the funds HDSB allowed to be deposited into the Cibola County Court Registry. HDSB argues that its mortgage includes the term "statutory mortgage condition" and that this term automatically creates a lien on proceeds. The Court disagrees. Section 47-1-41 applies only "in the event any of the following terms, conditions or obligations are broken by the mortgagor, ..." The undisputed facts do not establish that Debtor had broken any terms, conditions or obligations when Lot 7 was sold on August 20, 2008. The only evidence before the Court is that HDSB filed its foreclosure on

February 6, 2009. The Court cannot find that the statutory mortgage condition was relevant to the sale of Lot 7.

Therefore, if HDSB were to have a lien on these funds, it would have to be established by other statutes or by case law. HDSB cited neither, and the Court has found none. Cf. Uniform Commercial Code § 9-315(a), N.M. Stat. Ann. § 55-9-315(a):

> Except as otherwise provided in Chapter 55, Article 9 NMSA 1978, the Farm Products Secured Interest Act and in Subsection (2) of Section 55-2-403 NMSA 1978:
> (1) a security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien; and
> (2) a security interest attaches to any identifiable proceeds of collateral.

But Article 9 of the Uniform Commercial Code does not apply to "the creation or transfer of an interest in or lien on real property..." N.M. Stat. Ann. § 55-9-109(d)(11). Accord Lin v. Ehrle (In re Ehrle), 189 B.R. 771, 774-75 (9th Cir. BAP 1995) (Under California law, seller under a recorded deed of trust has no security in proceeds of sale. Under the UCC a security interest extends to cash proceeds of personal property but the UCC excludes real estate transactions.) Compare In re Zych, 379 B.R. 857, 861 (Bankr. D. Minn. 2007)(A perfected interest in cattle does not perfect an interest in a lawsuit for conversion of the cattle.)

Furthermore, under the facts of this case, it appears that HDSB waived its security interest in the proceeds when it

released those funds to the state court. <u>Clovis Nat'l Bank v.</u> <u>Thomas</u>, 77 N.M. 554, 561, 425 P.2d 726, 730 (1967). (When a creditor allowed sale of collateral and did not collect the proceeds directly, it lost its security interest and must look to the debtor personally for payment.)(Personal property case.) <u>Accord</u> <u>Charterbank Butler v. Central Cooperatives, Inc.</u>, 667 S.W.2d 463, 466 (Mo.App. 1984)(Same.).

### **4.     Even if HDSB had a lien, it was unperfected.**

It is clear to the Court that the lien on proceeds that HDSB had after the sale of Lot 7, if any, was not secured by real estate.  The mortgage was released on Lot 7 and it was sold. Therefore, any collateral must be personal property or some right in action.  HDSB did not file a financing statement.

### **5.     The Registry Funds are part of the Debtor's estate.**

HDSB argues that when it transferred the funds to the state court and obtained an Assignment of Any and All Excess Proceeds it retained ownership of the funds to the exclusion of Debtor. It also argues that after the transfer of funds it remained in constant control and constructive possession.  And, it argues that the Assignment demonstrates that all parties intended that Debtor would obtain no interest in the funds.

First, factually, HDSB transferred funds into a court registry fund associated with a case between Debtor and Westar; HDSB did not intervene.  The Assignment was not filed in that

Page  -30-

case.  Fact 22.  To the world, it would appear that the funds belonged either to Debtor or to Westar.  Nothing in the  record showed otherwise.  And, the very existence of the Assignment demonstrates that the parties contemplated that funds might fall into Debtor's hands and, if they did, Debtor had a duty to pay them to HDSB.  This looks like a loan of money to the Debtor, to be used for a specific purpose, and a retained security interest in any amount left over after satisfying that purpose.  And, HDSB would have an unliquidated claim for a refund of any money that Westar did not receive.  Pre-bankruptcy there may have been no equity in the funds, but this is still property.

The only other way these funds would not be property is if the Debtor held them in a constructive trust.  <u>See</u> 11 U.S.C. § 541(d)[12].  <u>See also</u> <u>Hill v. Kinzler (In re Foster)</u>, 275 F.3d 924, 926 (10th Cir. 2001)(Citations omitted.)  State law governs constructive trust issues, and the person asserting the trust has the burden to establish the trust requirements.  <u>Id.</u>  Before

---

[12]That section provides:
Property in which the debtor holds, as of the
commencement of the case, only legal title and not an
equitable interest, such as a mortgage secured by real
property, or an interest in such a mortgage, sold by
the debtor but as to which the debtor retains legal
title to service or supervise the servicing of such
mortgage or interest, becomes property of the estate
under subsection (a)(1) or (2) of this section only to
the extent of the debtor's legal title to such
property, but not to the extent of any equitable
interest in such property that the debtor does not
hold.

Page  -31-

imposing a trust, the Court should examine the equities of the situation, including examining whether it would be equitable to allow elevation of the claims of the creditor claiming the trust over other similarly situated creditors. Id. at 928. See also Torres, M.D., P.C. v. Eastlick (In re North American Coin & Currency, Ltd.), 767 F.2d 1573, 1575 (9th Cir. 1985), cert. denied, 475 U.S. 1083 (1986) ("We necessarily act very cautiously in exercising such a relatively undefined equitable power in favor of one group of potential creditors at the expense of other creditors, for ratable distribution among all creditors is one of the strongest policies behind the bankruptcy laws.")

Courts addressing the constructive trust issue find that property claimed to be held in constructive trust actually is bankruptcy estate property unless or until the creditor proves the existence of the constructive trust. United States v. Brimberry, 779 F.2d 1339, 1348 (8th Cir. 1985)("Until a court grants the victim such a constructive trust remedy, however, the victim merely has a right to seek such a remedy ... but the existence of such a right does not establish an interest in the specific property.")  The burden of establishing the trust is on the creditor.  Kinzler, 275 F.3d at 926 (citation omitted).[13]

_____

[13] Incidentally, some courts require that the constructive trust be declared by another court prepetition for it to be enforceable.  See Vineyard v. McKenzie (In re Quality Holstein Leasing), 752 F.2d 1009, 1013-14 and n.10 (5th Cir. 1985).  That
(continued...)

Case 09-10708-s11   Doc 211   Filed 03/22/11   Entered 03/22/11 15:33:49 Page 32 of 38

In this case, the Court does not find that imposing a constructive trust on the Registry Funds would be equitable. HDSB, a bank, finds itself as an unsecured creditor[14] because it did not perfect its interest, not because Debtor committed a wrong.

Furthermore, it is doubtful that on the evidence before the Court a constructive trust would be imposed.  Under New Mexico law,

> [a] constructive trust, on the other hand, except to the extent it may arise out of an express trust or the attempt to create one, is not imposed to effectuate the intention of the parties, but is imposed to prevent the unjust enrichment that would result if the person having the property were permitted to retain it. [5 A. Scott & W. Fratcher, The Law of Trusts (4th ed. 1989)] at §§ 404.2, 462.1.  The circumstances where a court might impose such a trust are varied.  They may involve fraud, constructive fraud, duress, undue influence, breach of a fiduciary duty, or similar wrongful conduct.  Id. at §§ 404.2 and 462; see, e.g., In re Estate of McKim, 111 N.M. 517, 807 P.2d 215 (1990); Garcia v. Marquez, 101 N.M. 427, 684 P.2d 513 (1984). When the court imposes a constructive trust the person holding title to the property is subject to an equitable duty to convey the property to another person as a remedy.

Aragon v. Rio Costilla Co-op. Livestock Ass'n, 112 N.M. 152, 156, 812 P.2d 1300, 1304 (1991).  In some situations, the mere existence of a fiduciary or confidential relationship may be

---

[13](...continued) did not happen in this case.

[14] And really, not even that, given that by virtue of the Deed in Lieu Agreement, discussed below, HDSB gave up any further claims it might have had.

Case 09-10708-s11    Doc 211    Filed 03/22/11    Entered 03/22/11 15:33:49 Page 33 of 38

sufficient to impose a constructive trust.  <u>Homes by Marilynn v.</u> <u>Robinson (Estate of McKim)</u>, 111 N.M. 517, 522, 807 P.2d 215, 220 (1991).  But, the facts in this case do not suggest any improper behavior by Debtor or anything except a debtor-creditor relationship between the parties.  The subject funds will be paid to the unsecured creditors of K-Ram.  It is difficult to find unjust enrichment when the disposition of these funds results from the operation of a bankruptcy statute.

HDSB's citation to <u>Admin. Comm. of the Wal-Mart Assocs.</u> <u>Health & Welfare Plan</u> is not persuasive.  In that case, the Court of Appeals for the Tenth Circuit discussed the differences between "legal" and "equitable" relief.  393 F.3d at 1121.  The Employee Retirement Income Security Act of 1974 ("ERISA") allows only "appropriate equitable relief" in certain circumstances. <u>Id.</u>  The Tenth Circuit referred to <u>Great-West Life & Annuity Ins.</u> <u>Co. v. Knudson</u>, 524 U.S. 204, 213 (2002) for the proposition that a plaintiff could seek restitution in equity, in the form of a constructive trust or equitable lien, only when money or property could be identified as belonging in good conscience to plaintiff and when it could clearly be traced to defendant's possession. <u>Wal-Mart Assoc.</u>, 393 F.3d at 1121.

In our case, the funds are traceable.  But, the Court cannot say that in "good conscience" the funds belong to HDSB.  The Court found above that HDSB had only a lien on the funds, and

that the lien was unperfected.  Therefore, as a matter of
bankruptcy law, those funds belong to the Debtor and, to the
extent HDSB has any claim at all, it is an unsecured claim to be
treated equally with other unsecured claims.

Wal-Mart Assoc. is further distinguishable because it was
basically a two-party case governed by equitable principles.  The
bankruptcy case, on the other hand, is governed by statute and
involves all of the creditors.  Bankruptcy laws have always
struck down "secret liens", see Butner v. United States, 440 U.S.
48, 54 n.8 (1979)(Citing § 110(c) of the Bankruptcy Act as
allowing a trustee to strike down secret liens), in furtherance
of the policy of equal treatment of similarly situated creditors,
see Howard Delivery Service, Inc. v. Zurich American Ins. Co.,
547 U.S. 651, 655 (2006)("[W]e are mindful that the Bankruptcy
Code aims, in the main, to secure equal distribution among
creditors.")  See also In re Foster, 275 F.3d at 926 (Stating
that Court should first consider whether circumstances of case
allow applying equity to elevate one class of creditors above
another.)

Finally, HDSB's contention that the funds were under its
control or constructive possession is irrelevant.  Control and
possession are not relevant to perfection of security interests
in commercial tort claims.  Perfection by possession applies only
to tangible negotiable documents, goods, instruments, money or

tangible chattel paper.  N.M. Stat. Ann. 1978 § 55-9-313[15].

Perfection by control applies only to investment property,

deposit accounts, letter-of-credit rights, electronic chattel

paper and electronic documents.  N.M. Stat. Ann. 1978 § 55-9-

---

[15]That section provides:
[A] secured party may perfect a security interest in
tangible negotiable documents, goods, instruments,
money or tangible chattel paper by taking possession of
the collateral.  A secured party may perfect a security
interest in certificated securities by taking delivery
of the certificated securities under Section 55-8-301
NMSA 1978.

Case 09-10708-s11    Doc 211    Filed 03/22/11    Entered 03/22/11 15:33:49 Page 36 of 38

314[16].  Neither of these sections provide for perfection in commercial tort claims.

**CONCLUSION**

For all the reasons stated, the Court will enter an Order granting Debtor's Motion for summary judgment and denying HDSB's Cross Motion.

_Honorable James S. Starzynski_
United States Bankruptcy Judge

---

[16]That section provides:
(a) A security interest in investment property, deposit accounts, letter-of-credit rights, electronic chattel paper or electronic documents may be perfected by control of the collateral under Section 55-7-106, 55-9-104, 55-9-105, 55-9-106 or 55-9-107 NMSA 1978.
(b) A security interest in deposit accounts, electronic chattel paper, letter-of-credit rights or electronic documents is perfected by control under Section 55-7-106, 55-9-104, 55-9-105 or 55-9-107 NMSA 1978 when the secured party obtains control and remains perfected by control only while the secured party retains control.
(c) A security interest in investment property is perfected by control under Section 55-9-106 NMSA 1978 from the time the secured party obtains control and remains perfected by control until:
(1) the secured party does not have control; and
(2) one of the following occurs:
    (A) if the collateral is a certificated security, the debtor has or acquires possession of the security certificate;
    (B) if the collateral is an uncertificated security, the issuer has registered or registers the debtor as the registered owner; or
    (C) if the collateral is a security entitlement, the debtor is or becomes the entitlement holder.

Date Entered on Docket:  March 22, 2011

Copies to:

Christopher M Gatton
Law Office of George Dave Giddens, PC
10400 Academy Rd., #350
Albuquerque, NM 87111

William F. Davis
6709 Academy NE, Suite A
Albuquerque, NM 87109

Leonard K Martinez-Metzgar
Office of the UST
PO Box 608
Albuquerque, NM 87103-0608